## MURRELL *vs.* WHITING & SUMNER.

[ACTION ON CHARTER-PARTY FOR BREACH BY CHARTERER.]

1. *Construction of charter-party as to rights and liabilities of parties.*—Under a charter-party providing for two successive voyages, "one voyage to be from Mobile to Toulon, and the other from Mobile to an Atlantic port in France; and reserving to the owners of the vessel the right to send her, "after the termination of the first voyage, to any other port in Europe to load for any port in the United States, proceeding from such port to Mobile to commence the second voyage," and the further right, "in case France should engage in war, to annul the contract for the second voyage,"—on France becoming engaged in war before the termination of the first voyage, the owners of the ship have the option, to be exercised by them within a reasonable time, and notice thereof to be given to the charterer, to annul the contract for the second voyage; but, on their failure to exercise this

optional right, they are bound to offer, within a reasonable time after the termination of the first voyage, to make the second voyage, unless discharged or excused by the charterer from making that offer ; and, failing to make that offer within such reasonable time, they cannot hold the charterer liable, on his abandonment of the contract, for failing to furnish a cargo for the second voyage.

2. *Same, as to time of performance and breach.*—What is a reasonable time, within which an offer of performance must or may be made, is often a question for the court ; but, where a charter-party, providing for two voyages from Mobile, one to Toulon, and the other to some Atlantic port in France, secures to the owners of the vessel the right to send her, after the termination of the first voyage, " to any other port in Europe to load for any port of the United States, proceeding from such port to Mobile to commence the second voyage," it is a question for the determination of the jury, whether an offer to perform the second voyage is made within a reasonable time after the termination of the first ; and this, notwithstanding the written evidence in the case, consisting of the correspondence of the parties, shows the dates at which the vessel touched at her several ports.

3. *Same, as to measure of damages for breach by charterer.*—In the absence of special circumstances, it is the duty of the master of a chartered vessel, on the failure or refusal of the charterer to furnish the cargo as agreed on, to avail himself of all ordinary means and proper opportunities to obtain another cargo ; and if he neglect to perform this duty, the owners cannot hold the charterer liable for the increased damages resulting from such neglect.

4. *Burden of proof on question of damages.*—The owners of the chartered vessel having proved their offer to make the second voyage, as stipulated, within a reasonable time after the termination of the first, and the failure of the charterer to furnish the cargo as agreed on, the *onus* devolves on the charterer of proving, in mitigation of damages, that another cargo for the vessel might have been obtained by the use of ordinary means and proper opportunities on the part of the master or owners.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THIS action was brought by the appellees, as the owners of the ship *European,* to recover $15,000 damages for the defendant's breach of contract, in failing to furnish said ship with a cargo for a voyage "from Mobile to an Atlantic port in France." The said ship was chartered by the defendant, on the 20th December, 1853, from J. P. Whitney & Co., of New Orleans, who were the agents of the owners; the charter-party containing the following, with other stipulations : "It is further agreed between the said parties, that this charter-party shall be binding for two successive voyages, on the terms as above stated; one voyage to be from Mobile to Toulon, and the other

voyage from Mobile to an Atlantic port in France; the party of the second part having the right, after the termination of the first voyage, to send the ship to any other port in Europe, to load for any other port of the United States, proceeding from such port to Mobile to commence the second voyage under this agreement; the freight or charter returning from Europe being for account of the parties of the second part; and the parties of the second part also reserve the right to annul the contract for the second voyage, in case France should engage in war." It was further stipulated in the charter-party, that the cargo out should consist of masts and naval lumber, and that the ship should be allowed "twenty working days" for discharging her cargo. The first voyage was made as stipulated, and the action was brought to recover damages for the defendant's failure to furnish a cargo for the second voyage.

The defendant pleaded, 1st, the general issue; and, 2d, a special plea, averring that he abandoned the contract, after the termination of the first voyage, as he had a right to do, because the plaintiffs would not elect, within a reasonable time, though requested by him so to do, whether they would proceed with the second voyage, or would annul the contract as to it on account of France having become engaged in war. A demurrer was interposed to this special plea, but the record nowhere shows what disposition was made of it.

It appeared from the evidence adduced on the trial, as the same is set out in the bill of exceptions, that the ship was loaded with spars and naval lumber, and started on her first voyage in the early part of the year 1854; but at what particular time is not shown. It was admitted that, in February or March, 1854, after the ship had sailed, France became engaged in war with Russia. On the 25th April, 1854, the defendant wrote a letter to Mess. J. P. Whitney & Co., plaintiffs' agents at New Orleans, requesting them to inform him whether, since France had become engaged in war, the ship would make a second voyage. This letter, with the subsequent correspondence between the parties, (fifteen letters in all,) "which corres-

pondence was read by consent of both parties, with the understanding that the letters should be considered as evidence only so far as their contents were legal proof," is made a part of the bill of exceptions. The correspondence shows that, in reply to defendant's first letter, and again in reply to three other letters from him, in similar terms, dated respectively the 16th May, the 3d June, and the 14th July, Mess. Whitney & Co. declined to state whether the ship would make a second voyage under the contract, insisting that they were not bound to make their election until the ship had completed her first voyage; that they informed defendant, on the 20th September following, that the ship had left Marseilles, bound for New Orleans, on the 15th August, and would be sent round to Mobile for the second voyage so soon as she had arrived and been put in repair; that defendant, in reply, stated that he had chartered another vessel in consequence of the uncertainty attending the second voyage of the *European*, but, on her arrival, would do what was right and proper under the circumstances; that Whitney & Co., under date of the 10th October, notified defendant that the ship had arrived, and would be got ready for a second voyage as soon as possible; and that defendant replied, declining to furnish another cargo, and denying his liability to furnish another. It does not appear at. what time the ship reached Toulon, except that it was "some time ago" on the 3d June, 1854. She proceeded from Toulon to Marseilles, where she was detained by the cholera from before the 10th June to the 15th August, when she sailed for New Orleans, which port she reached on the 10th October.

The plaintiffs also introduced the depositions of two witnesses, who testified to the price of freights during the period of time covered by the two contemplated voyages of the ship, and the expenses and profits of a voyage to a European port; further, "that two months is a full and sufficient time for a sailing ship to make a voyage from Mobile to an Atlantic port in Europe;" and that the ship *European*, after the completion of her first voyage under

the charter-party, "remained unemployed until March, 1855." The defendant introduced evidence, "tending to show that it was a matter of some difficulty to obtain ships to carry naval lumber to a European port, owing to the fact that but few vessels had port-holes large enough to receive it, and it was a more difficult and expensive cargo than cotton or the other usual cargoes from the United States; that it was a matter of great importance for a shipper of naval lumber to know with certainty, several months beforehand, that he had a vessel ready to receive the timber; that timber was greatly injured if exposed to the weather for a considerable time, and, if there was no vessel to be had for some time when it was procured, had to be sunk in fresh water, which was attended with heavy expense; that it was of great importance, for this reason, to all those engaged in that business, to have ships ready to receive the timber as soon as it was delivered at Mobile; and that it required several months to have a ship-load of timber cut and delivered at Mobile." The defendant also offered to prove "the rate of freight at Mobile and New Orleans for the carriage of cotton and naval timber to France and other European ports, and that there were large quantities of cotton and other produce to be so shipped; also, that the ship *European*, which had been proved to be an American vessel, and at her home port in New Orleans, was capable of and adapted to the carriage of either cotton or timber; but he did not offer to prove any tender of freight to the ship *European*, or any employment directly tendered to her, during the months of October, November and December, or during the time it would have required to make the second voyage. The court excluded this proof, on motion of the plaintiffs, and the defendant excepted."

"On this evidence, the court charged the jury as follows:

"The plaintiffs claim damages from the defendant by reason of his refusal to perform a charter-party of the ship *European*. Defendant denies that he has failed to perform his contract, and insists that the plaintiffs, by their acts, had released him from the performance of it. By the

terms of the contract, it seems that, in December, 1853, the plaintiffs agreed to prepare their said ship, then in New Orleans, and to send her round the bay of Mobile, and take a load of masts, spars, staves, &c., to a port in France, at certain specified rates of freight; that, after discharging her cargo, she might take a freight to any other port in Europe, and from thence to a port in the United States, and thence to Mobile for a second cargo to France; with a proviso in the charter, that the plaintiffs might decline to make the second voyage if France should engage in war. It seems that the ship took her first cargo to Toulon, where she arrived on or about the 10th June, 1855 (?) and discharged her cargo, and left Marseilles on the 28th August following, and arrived in New Orleans on the 10th October; that the plaintiffs then notified the defendant that the ship would at once proceed to Mobile for her second voyage, but the defendant declined to load her. The defendant insists that he was justified in so doing, 1st, because war was declared between France and Russia late in February, or early in March, 1854, and, on his requesting plaintiffs to say whether they would perform the second voyage or not, they declined and refused to say whether they would perform the second voyage; and, 2d, that the ship was not ready and did not offer to perform the second voyage within a reasonable time after the performance of the first voyage.

"In reference to the first matter, the whole correspondence on the subject is before you; and, it being in writing, it is my duty to charge you as to its effect, as well as the charter-party. Without referring in detail to the letters, I charge you, that the plaintiffs were not bound, at the time the letter of the 25th April was received by them, to determine whether or not they would perform the second voyage; but, if they failed or refused, within a reasonable time after the declaration of war by France, to elect whether or not they would perform a second voyage, they lost their right to elect, and became bound to perform the second voyage according to the terms of the charter-party; and such being the proper construc-

tion of the charter-party, the defendant was bound by its terms as if the plaintiffs had elected to perform the second voyage. The question of reasonable time is for you to determine.

"In reference to the second matter, if you believe that the statements of the letters correctly indicate the dates of the ship's arrival at the different ports, it is my opinion that the ship was offered and tendered to perform the second voyage within a reasonable time, to comply with the terms of the contract. All the evidence of the contract, as well as that offered to show a breach of it, that is, the correspondence, &c., being in writing, it is my duty to charge you as to its effect; and my opinion on this point of the case is, that there is no evidence that the plaintiffs have failed to perform the terms of the charter-party; but, if you believe the evidence that is before you, it appears that they have offered to perform the second voyage, and that the defendant refused to load the ship for that voyage, are entitled to recover. (?)

"If, therefore, you believe the evidence that is before you, the plaintiffs are entitled to recover such damages as it is shown to you they have sustained by reason of the defendant's refusal to load the ship for the second voyage; and in order to determine this, you will ascertain what has been the actual loss sustained by them,—that is, what amount of money as freight on the voyage have they lost, estimating the freight that they would be entitled to according to the charter-party. As to the credibility of the writing, you will determine upon the whole of it, and find the facts yourselves."

The defendant excepted to each part of this charge, and then requested the following charges :

"1. That the defendant, after France became engaged in war with Russia, had the right to inquire of the plaintiffs whether or not they would perform the second voyage under the charter-party; and, upon such inquiry being made, it became the duty of the plaintiffs to elect within a reasonable time, and to inform the defendant, whether or not they would perform the second voyage; and if they failed so to inform the defendant within a

reasonable time, then the defendant had the right to consider the contract at an end, and, in that event, would be justified in refusing to load the vessel for the second voyage.

"2. That as the plaintiffs had the right, after France engaged in war, to perform the second voyage or not, the defendant had the right to determine whether or not he would provide a cargo for the second voyage.

"3. That it was for the jury to decide, under all the circumstances of the case, whether the plaintiffs offered to perform the second voyage within a reasonable time or not; that in determining what was a reasonable time, they must look to all the circumstances of the case, to the contract itself, and to the nature of the business; and if they believed that the plaintiff did not offer to perform the second voyage with a reasonable time, then the defendant was not bound to furnish the second cargo."

The court refused each one of these charges as asked, but offered to give the third with this qualification: "That if the jury believed that the statement of the letters correctly indicated the dates of the ship's arrival at the different ports, then the plaintiffs had offered to perform the second voyage within a reasonable time." To the refusal of the charges as asked the defendant excepted.

The errors now assigned are: "1st, the sustaining of the demurrer to the second plea; and, 2d, the bill of exceptions, and all things therein contained."

E. S. Dargan, and P. Hamilton, for the appellant. 1. The court erred in the first part of the charge given, and in the refusal of the first charge asked. The contract related to the carriage of naval timber to a foreign port. The plaintiffs knew the nature of the trade, and the necessity of certainty and promptitude. It was the duty of the plaintiffs, on inquiry by the defendant, to inform him within a reasonable time whether they would perform the second voyage; and their failure to make an election within a reasonable time gave the defendant a right to consider the contract abandoned.—2 Parsons on

Contracts, 181, 182, note; Vyse v. Wakefield, 6 Mees. & W. 442; 7 *ib*. 126; 12 *ib*. 725; 1 N. H. 246; 7 Dana, 435; 75 E. C. L. 678.

2. The court clearly erred in determining, as matter of law, that the offer to perform the second voyage was made within a reasonable time.—Drake v. Gorce, 22 Ala. 409; Watts v. Sheppard, 2 Ala. 425; 3 Sumner, 530.

3. The court erred, also, in its ruling on the question of damages, and in the exclusion of evidence on that point.—Sedgwick on Damages, 263; 3 Gray, 92; 24 Wendell, 304; 21 Wendell, 457; 4 Eng. (Ark.) Rep. 394; 8 Ala. 234; 2 Metc. 615; 7 Greenl. 51; 8 Peters, 81; 2 Gallison, 61.

A. J. Requier, and Jno. T. Taylor, *contra.*—1. The stipulation of the charter-party, reserving to the plaintiffs the right to abandon the second voyage in the event France should engage in war, was intended solely for their benefit. They were not bound to make their election, until the time had arrived when their promise was to be performed; and if they failed to elect to abandon the second voyage, the defendant was bound to provide a second cargo.—2 Parsons on Contracts, 170; 3 John. Cas. 81; 2 *ib*. 254; 1 Term Rep. 132; Doug. 23; 7 Ala. 777; 10 *ib*. 115; 4 Yerger, 177; 5 Humph. 423; 14 Vermont, 457; 3 Day, 327; 2 Penn. 63; 2 Greene, 205; 3 Scam. 389; 17 Vermont, 105.

2. What is reasonable time, the facts not being disputed, is a question of law.—22 Maine, 177; 13 Conn. 28; 1 Parsons on Contracts, 502; 2 *ib*. 173; also, 25 Ala. 710; 23 Ala. 657; 29 Ala. 293.

3. The measure of damages which the plaintiffs were entitled to recover, was the actual loss.—2 Greenl. Ev. § 261 *a;* 15 Johns. 327; Sedgwick on Damages, 377; 8 Barbour, 427; 2 Denio, 609; 3 Selden, 262; 11 Miss. 11; 8 Ala. 234; 9 Ala. 292; 11 Ala. 375; 24 Ala. 194. The same authorities sustain the ruling of the court below in excluding the evidence which tended to show that plaintiffs might have procured another cargo.

RICE, C. J.—The charter-party bears date December 20th, 1853. It provides, that it shall be binding for two successive voyages, on the terms therein specified; "one voyage to be *from Mobile to Toulon,* and the other voyage *from Mobile to an Atlantic port in France.*" It secures to the owners of the ship "the right, after the termination of the first voyage, to send the ship to any other port in Europe, to load for any port of the United States; proceeding from such port to Mobile, *to commence the second voyage.*" It also reserves to the ship-owners "the right to annul the contract for the second voyage, in case France should engage in war."

The evidence tends to show, that France did engage in war, about the last of February, 1854, and *before the termination of the first voyage,* that is, the voyage "*from Mobile to Toulon.*" We shall assume such to be the fact, and proceed to lay down what seems to us to be the law applicable to the case as we understand it to be presented by the record.

As soon as France became engaged in war, it became optional with the owners of the ship "to annul the contract for the second voyage;" and the law allowed them a reasonable time, *after France became engaged in war,* for the exercise of that option. If, within such reasonable time, they had determined to annul the contract for the second voyage, and had given notice thereof to the charterer, the contract as to the second voyage would have been entirely at an end. If, however, within such reasonable time, they did not exercise their option, by putting an end to the contract because France had engaged in war, and did not give to the charterer any notice of the exercise of their option, then their right to exercise the option was lost. If the option was lost, in this or any other manner, then the contract is to be construed, as if the clause securing it to the owners of the ship had been expunged, or had never been inserted in it.—Abbott on Shipping, 270; 2 Parsons on Contracts, 163, 170, 180, 184; Disborough v. Neilson, 3 Johns. Cases, 81; Rodemer v. Hazlehurst, 9 Gill, 292; Vyse v. Wakefield, 6 Mees. & W. 442; same case, 7 *ib.* 678; 6 *ib.* 82; Nesbitt v. Ware & McClana-

han, 30 Ala. Rep. 68; Choice v. Moseley, 1 Bailey's Rep. 136.

One of the obligations imposed by the contract upon the owners of the ship was, that within a reasonable time after the termination of the first voyage, they would offer to make the second voyage. From that obligation they might have exonerated themselves, by exercising their option to annul the contract as to the second voyage, and giving notice of such exercise, *within a reasonable time after France engaged in war*. But, as they did not exonerate themselves in that way, and as there is no evidence tending to show that they were discharged or excused by the charterer from making that offer, that obligation was broken by them, if, *within a reasonable time after the termination of the first voyage*, they did not offer to make the second voyage. If they were thus guilty of a breach of the contract, their breach authorized the charterer to abandon the contract as to the second voyage, and, upon such abandonment, to defeat a recovery by them under such a complaint as they have filed in this case. The stipulations as to the first voyage are distinct from the stipulations as to the second voyage; admit of being separately executed and closed, and, *after having been executed and closed*, must be taken distributively, and considered as if they formed the matter of a separate agreement. The stipulations which form the contract as to the second voyage are entirely *executory ;* and a party cannot maintain an action on the *executory contract*, which was first violated by him, and which was thereupon abandoned by the other party.—Cutter v. Powell, and the notes thereto, as reported in 2 Smith's Leading Cases, 1–53, and in the 44th volume of the Law Library, 25, and cases cited in note 5.

[2.] In Abbott on Shipping, (6th American edition,) 249, it is laid down, that "in all maritime transactions, expedition is of the utmost importance; for, even by a short delay, the season, or *object* of a voyage, may be lost." That position has a strong bearing on the present case, in determining whether the offer to make the second voyage was made within a reasonable time after the termination

of the first. But there are so many other matters, besides that, to be considered in determining that question, that we cannot hesitate to declare, that the question must be left to the jury. No court can judicially know what delay at Toulon, the place named as the termination of the first voyage, would have amounted to unwarrantable delay; nor what delay in going to the other port in Europe, to which the ship had a right to go from Toulon for a cargo, would have amounted to unreasonable delay; nor what delay at that other European port would have amounted to unreasonable delay; nor what delay in returning from that port to New Orleans would have amounted to unreasonable delay. The mere dates of the arrival of the ship at these respective places, as stated in the evidence, cannot authorize the court to say that there was no unreasonable delay, nor that the offer to make the second voyage was made within a reasonable time after the termination of the first voyage. The nature of the contract, and of the cargo, the object of the second voyage, and all the circumstances attending the delays of the ship, and her movements from place to place, together with the dates of her arrival at the several ports, must be taken into consideration; and, in view of all the evidence (including the correspondence between the parties) bearing on the point, the jury must determine whether the offer by the owners of the ship to make the second voyage was made within a reasonable time after the termination of the first voyage. Although what is reasonable time is often a question for the court, it is not always so. It is not so in the present case.—3 Starkie on Ev. (edition of 1826, by Metcalf,) 1407; 2 Parsons on Contracts, 173, 174, note (*g;*) Ellis v. Thompson, 3 Mees. & W. 445; Cocker v. Franklin Manufacturing Co., 3 Sumner's Rep. 530; Howe v. Huntington, 15 Maine Rep. 320, and authorities there cited.

[3.] If, however, the jury should find for the owners of the ship, then the question comes up, what is the measure of damages. And here it is very important to bear in mind the distiction between *the right to recover* and *the measure of the recovery.* The question, whether the

plaintiffs are entitled to recover, is very different from the question, *how much* shall they be permitted to recover.

In George v. Cahaba & Marion R. R. Co., 8 Ala. Rep. 234, our own court very justly say, "It is perhaps impossible to ascertain any one rule, which will cover *all classes of contracts, in regard to the damages which may be awarded to the injured party.*" In that case, Shannon v. Comstock, 21 Wend. 457, is cited with approval; and there is a strong, and, we think, correct intimation, that *in cases like the present,* "*the general measure* by which to ascertain the damages," is the profits of which the plaintiffs have been deprived "*by the defendant's breach of contract.*" "The damage to be recovered must always be *the natural and proximate consequence of the act complained of.*"—2 Greenl. on Ev. § 256; Walker v. Walker, 26 Ala. Rep. 262, and authorities there cited. The recovery must be confined to such losses and damages as are direct and immediate, and naturally flow *from the breach of contract alleged and proved;* in other words, the breach of the contract must be *the cause, and not merely the occasion,* of the losses or damages, to entitle the plaintiffs to recover them.—Moore v. Appleton, 26 Ala. R. 633, and authorities there cited. *Full indemnity* to the plaintiffs for *such losses or damages* is all that they are legally entitled to recover. "If the party entitled to the benefit of the contract can protect himself from the loss arising from a breach, at a reasonable expense, or with reasonable exertions, he fails in his social duty if he omit to do so, regardless of the increased amount of damages for which he may intend to hold the other contracting party liable." "It is his duty to seek other employment. Idleness is, in itself, a breach of moral obligation. But, if he continue idle for the purpose of charging another, he superadds a fraud, which the law had rather punish than countenance." In the absence of special circumstances to the contrary, the law makes it the duty of the master of such a ship as that of the plaintiffs, in case of the failure or refusal of the charterer to furnish the cargo as agreed on, to avail himself of the ordinary means and of all proper opportunities to

obtain another cargo. If he fail to perform that duty, and thereby the damages are enhanced, the owners of the ship cannot recover the increase of damages resulting from the voluntary neglect of duty on the part of the master. If by performing that duty the loss from the defendant's breach of contract would have been mitigated, the failure to perform it deprives the plaintiffs of the right to recover any damages or loss which would have been avoided by its performance.—Shannon v. Comstock, *supra;* Heckscher v. McCrea, 24 Wend. 304; Bailey v. Damon, 3 Gray's R. 92 ; Addison on Contracts, (edition of 1857,) 1152.

[4.] If the evidence for the plaintiffs simply shows that, within a reasonable time after making the first voyage, under the contract, they offered to make the second voyage, and that the charterer failed or refused to furnish the cargo as agreed on, then the law casts upon him the burthen of proving that, by the use of the ordinary means and of all proper opportunities on the part of the master or owners of the ship, another cargo could have been obtained, and the loss from the charterer's breach of contract thereby mitigated.

The views above expressed, and the authorities above cited, are deemed sufficient to guide the future progress of this case. We will not extend this opinion by making any special application of them to the rulings of the court below, as it is manifest from them that the court below erred in several respects.

For these errors the judgment is reversed, and the cause remanded.